IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs November 17, 2021

**DEMETRIUS GRIMES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 116427   Kyle A. Hixson, Judge**

————————————————————

**No. E2021-00120-CCA-R3-PC**

————————————————————

Petitioner, Demetrius Grimes, appeals the denial of his post-conviction petition arguing that the post-conviction court erred in denial of his petition. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Demetrius Grimes.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner was charged with two counts of attempted first-degree murder, four counts of employing a firearm during the commission of a dangerous felony, one count of attempted first-degree murder with serious bodily injury, two counts of attempted robbery with a deadly weapon, three counts of attempted carjacking, one count of aggravated assault with a deadly weapon, one count of aggravated assault with serious bodily injury, and four counts of employing a firearm during the commission of a dangerous felony with a prior felony conviction. Petitioner's first trial resulted in a mistrial following a hung jury.

In his second trial, a jury convicted Petitioner of two counts of attempted first-degree murder (Counts 1 and 11), five counts of employing a firearm during the commission of a dangerous felony (Counts 2, 4, 8, 10, 12), four counts of employing a firearm during the commission of a dangerous felony with a prior dangerous felony conviction (Counts 15, 16, 17 and 18), two counts of attempted especially aggravated robbery (Counts 5 and 6), two counts of attempted carjacking (Counts 7 and 9), one count of attempted first-degree murder with serious bodily injury (Count 3), and two counts of assault (Counts 13 and 14). Petitioner was sentenced to a total effective sentence of sixty years. This court affirmed the judgment in Counts 1 through 14, but reversed the judgments for Counts 15 through 18 which enhanced the firearm-employment counts in Counts 2, 4, 8, 10, and 12, because the prior felonies alleged were not "dangerous" as required by statute. *State v. Demetrius Grimes,* No. E2017-01022-CCA-R3-CD, 2018 WL 5839950 at *1 (Tenn. Crim. App., at Knoxville, Nov. 7, 2018). Petitioner did not file an application for permission to appeal to the Tennessee Supreme Court.

This court's opinion on direct appeal summarized the facts at trial as follows:

> As we will set out, the State's proof showed that the [Petitioner] fired shots with a pistol at B.J.'s Market in Knoxville on the evening of March 8, 2014, striking Carl Chesney and Michael Dixon. Mr. Chesney had no prior connection with the [Petitioner], while Mr. Dixon was acquainted with Mr. Ramod Shepard, a passenger in the [Petitioner]'s vehicle, from when both were inmates at the same prison. The [Petitioner] fired approximately seven shots in all, striking Mr. Dixon twice in the leg and Mr. Chesney once in the foot. Now, we will review the trial testimony.
>
> The first two witnesses for the State were Michael Alan Mayes and Cheryl Green. Mr. Mayes, the record keeper for the Knox County Emergency Communications District, played a recording of the 9-1-1 calls from B.J.'s Market just after the shooting. Ms. Green testified regarding the medical records of the victim, Michael Dixon, and his injuries as the result of being wounded. Danielle Wieberg testified that she was a crime scene technician with the Knoxville Police Department and various photographs taken at the crime scene received as exhibits during her testimony, as well as various items of physical evidence collected at the scene.
>
> Steven Charles Lundy, Sr., testified that he was working at B.J.'s Market the evening of the shooting, when he heard gunshots and saw people running. One of the wounded men came into the store and

- 2 -

fell down, and Mr. Lundy continued to hear shots being fired outside. He testified that he had identified the [Petitioner] in a photo lineup as the shooter, and he identified the [Petitioner] again in the courtroom.

Carl Chesney testified that that he had been wounded while at B.J.'s Market on March 8, 2014. He was shot in the foot while he was outside, waiting for a food order. He said he did not see who shot him.

Michael Dixon was wounded the same evening, also at B.J.'s Market, where he had driven his vehicle to purchase gasoline, when he was returning to his vehicle after paying for it. On the way to his car, he recognized Ramod Shepard, whom he earlier met when they were incarcerated at the same penal institution. Mr. Shepard got out of a black car, which had just pulled up to Mr. Dixon, as did the [Petitioner], Demetrius Grimes. The [Petitioner] was armed with a pistol, which he pointed at Mr. Dixon, demanding the keys to his car. A third man got out of the black car, as well as a woman, Latickia Burgins, who was repeatedly saying to the victim, "just give him the keys." As she got into the victim's car, the [Petitioner] pointed his pistol at the victim, saying he would shoot if he were not given the keys. The [Petitioner] pulled the trigger, but his weapon misfired. As the victim then ran back towards the store, he heard gunshots and was struck twice in one of his legs. He was taken to a hospital, where he received two blood transfusions, and had two operations, with a rod being inserted into his leg. The victim said that he now walks with a limp, and his leg swells daily. Mr. Dixon said he had identified the [Petitioner] as his shooter in a photographic lineup while in the hospital, and he identified the [Petitioner] during his testimony.

Tim Riddle testified that he was employed by the Knoxville Police Department as a major crimes investigator and had responded to the shooting call at B.J.'s Market. From witnesses at that location, he learned that the shooter was a black male, with long dreadlocks, who had been wearing "fancy glasses." He later met in the hospital with Mr. Dixon, who told him that Ms. Burgins had been involved in the shooting, as well as the [Petitioner], whom the victim knew as Demetrius or Demetria Grimes. The other victim, Mr. Chesney, was reluctant to speak with Officer Riddle or to assist in the prosecution

of the shooting. When shown the photographic lineup, Mr. Chesney pointed to the photograph of the [Petitioner] but refused to sign the card as having done so. Officer Riddle testified regarding the surveillance video from the time of the shooting, saying it showed Ramod Shepard getting out of a black car, followed by the [Petitioner], who put a gun in Mr. Dixon's face. The [Petitioner] then fired the weapon, sending others running, returned to his vehicle and drove off with his companions. Following this testimony, the State rested its case-in-chief. The [Petitioner] presented no witnesses at trial.

Petitioner's timely petition for post-conviction relief was placed into the prison mail system on September 30, 2019. In his petition, Petitioner asserts the following grounds for relief: Trial counsel was ineffective (1) for failing to interview or secure the testimony of [Sean McKeever][1] as an alibi witness; (2) for failing to effectively cross-examine Carl Chesney; (3) for failing to sufficiently challenge the use of the audio tape of Mr. Chesney's photographic lineup during Detective Riddle's testimony; and (4) cumulative error. In addition, at the post-conviction hearing, Petitioner testified that his trial counsel was ineffective for (5) failing to address the effects of Steve Lundy's outburst on the jury.

*Post-Conviction Hearing*

Petitioner testified about his convictions, the procedural history of the case, and the post-conviction court took judicial notice of the trial transcripts and the underlying technical record of Petitioner's convictions.

Petitioner testified that Detective Tim Riddle approached victim Carl Chesney to see if he could identify Petitioner in a photographic lineup and that Detective Riddle recorded the interview with a recording device. Mr. Chesney was not aware that he was being recorded during his interview with Detective Riddle. According to Petitioner's testimony, when Mr. Chesney pointed to Petitioner's photo, Detective Riddle said, "Man, that's him. That's the guy. That's the guy." Detective Riddle then asked Mr. Chesney to circle the photo and to sign his name to the identification, and Mr. Chesney refused to do so. During Petitioner's second trial, Mr. Chesney testified that he did not know who Petitioner was and that he could not identify him in a lineup. According to Petitioner, the audio recording made by Detective Riddle was then played for the jury for impeachment

_____

[1] Petitioner's petition for post-conviction relief refers to the witness as "Shawn McKever," although the record is clear and indicates that his name is "Sean McKeever," so we will refer to him accordingly.

- 4 -

purposes. Petitioner testified that the State failed to provide the audio recording in discovery. Petitioner testified that he had gone over discovery with trial counsel on "six or seven" occasions prior to trial, but he was unaware of the recording of Mr. Chesney's identification until it was played during his trial. Petitioner contends that when the State offered the recording at trial, trial counsel asked, "What is going on?" Petitioner testified that a bench conference then occurred and that he did not know what was said, but following the bench conference, trial counsel returned to him and said, "I guess they're going to—she's going to impeach her own witness." Petitioner testified that trial counsel did not object. Petitioner could not recall whether trial counsel objected to hearsay regarding Detective Riddle's testimony regarding Mr. Chesney's identification of Petitioner. Petitioner also testified that Mr. Chesney should have been more effectively cross-examined because he did not have firsthand knowledge of the facts of the case. On cross-examination, Petitioner conceded that he had a copy of the discovery responses, although it was not with him during his testimony. When the State directed Petitioner's attention to a disclosure from May 27, 2014, with a CD labeled "Statement from C. Chesney" attached, Petitioner acknowledged, "I mean, I guess I have that." Petitioner then explained that he did not have the CD, although he did have the paper disclosures.

Petitioner testified that Mr. Chesney's medical records were not disclosed in discovery. Petitioner also testified that trial counsel did not effectively cross-examine the medical records custodian as to the severity of Michael Dixon's injuries. Petitioner discussed Mr. Dixon's medical records with trial counsel prior to trial, and based on that review, he believed that the medical records indicated that Mr. Dixon's injuries were moderate, not life-threatening.

On cross-examination, Petitioner acknowledged that he did receive Mr. Dixon's medical records and that he did not know whether Mr. Chesney had even gone to the hospital. Petitioner further conceded that the State did not admit Mr. Chesney's medical records at trial. Petitioner testified that trial counsel was ineffective in cross-examining Mr. Dixon as to the severity of his injuries. According to Petitioner, trial counsel should have cross-examined the State's medical expert on the fact that Mr. Dixon's injuries were not "life-threatening." However, Petitioner agreed that Mr. Dixon's medical records were entered into evidence.

Petitioner alleged that he had an alibi witness, Sean McKeever, who testified in Petitioner's first trial, but who was not called to testify on his behalf in the second trial. Petitioner testified that he thought Mr. McKeever was present at his second trial but that the prosecutor stated that she did not need him and allowed him to go home. Petitioner did not believe that trial counsel had subpoenaed Mr. McKeever to be present at trial. Petitioner complained that trial counsel did not object to the State's release of a witness who allegedly had exculpatory information. Petitioner testified that because Mr.

McKeever was inside B.J.'s Market with the two other witnesses, Mr. McKeever's testimony would have shown that the witnesses who testified against him would not have been able to observe the shooting. On cross-examination, Petitioner testified that he talked to trial counsel about wanting to introduce Mr. McKeever's previous testimony at trial. However, she told him that it was too late for him to be called as a witness and that he was out of town, "or something of that sort." As a result of Mr. McKeever's unavailability at Petitioner's second trial, his testimony from the mistrial was admitted into evidence, but was not read to the jury. Petitioner testified that he met with trial counsel before both trials in preparation and that he believed trial counsel had done a "good job" on the first trial, despite its resulting in a hung jury.

Petitioner then testified about his concern regarding Steve Lundy's outbreak during his testimony. Petitioner testified that Mr. Lundy began to scream while he was on the stand making trial counsel uncomfortable. Petitioner testified that trial counsel stated that she did not feel safe after Mr. Lundy's outbreak and that she wanted extra security in the courtroom. Petitioner said, "[The trial court] asked for the jury to step out once he began to scream and holler in the courtroom when [trial counsel] was cross-examining."

Trial counsel testified that at the time of Petitioner's trial she had been practicing law for twenty-nine years and was licensed in both Tennessee and Georgia. In 2006, trial counsel began her own practice handling primarily divorce, juvenile law, family law, and criminal defense. Prior to private practice, trial counsel worked as an Assistant District Attorney General in Knox County, Tennessee for four years, and she practiced in insurance defense for ten years in Georgia before moving to Tennessee. Trial counsel testified that prior to Petitioner's trial, she had handled at least forty jury trials, including murders and attempted murders and other Class A and B felonies.

With respect to her approach in defending criminal cases, trial counsel testified that she obtains discovery and then meets with her clients to discuss the discovery materials and to strategize. Trial counsel did not have issues in obtaining discovery from the State in Petitioner's case, and she testified that she met with Petitioner at least twenty times prior to his trial. Trial counsel discussed the discovery with Petitioner in detail, and testified that Petitioner was engaged in his defense and that Petitioner provided helpful information to trial counsel. Petitioner compiled summaries for trial counsel and noted helpful information in the medical records pertaining to his case. Trial counsel believed that she had a good relationship with Petitioner.

Trial counsel testified that Mr. Chesney's first reference to his identification of Petitioner during the photographic lineup was during the prosecutor's redirect examination of him. Trial counsel objected to the question because Mr. Chesney had indicated a lack of memory regarding the event. Trial counsel interjected an objection to the prosecutor's

attempt to refresh Mr. Chesney's recollection by allowing him to listen to the recording of his interaction with the detective during the photographic lineup, despite Mr. Chesney's saying that he did not know if doing so would refresh his recollection. During a jury-out hearing, Mr. Chesney listened to the recording, and the trial court indicated that the jury would not be allowed to hear the recording. Because Mr. Chesney testified thereafter that he did not point at or identify anyone in the lineup, the trial court allowed Detective Riddle, who had conducted the photographic lineup, to testify to the contrary. Trial counsel explained that she was sure that she reviewed the recording of Mr. Chesney's identification with Petitioner. Specifically, trial counsel testified, "We went over every disc that I had. I feel confident that we went over it. I can't remember specifically going through that, but we went over everything in detail." Trial counsel believed that she would have objected to hearsay evidence but deferred to the trial transcript as to whether or not she did raise an objection. The record reflects that trial counsel did not object to Mr. Riddle's testimony at trial.

With respect to Mr. McKeever's testimony, trial counsel testified that at the time of trial, Mr. McKeever was either ill himself or he had a family member who was ill, and thus he was unavailable as a witness for the trial. She recalled that she had conversations with the prosecutor about offering a transcript of Mr. McKeever's testimony from the first trial as evidence in the second trial, which they did. Trial counsel did not subpoena Mr. McKeever because he had been subpoenaed by the State.

Following Petitioner's post-conviction hearing, the post-conviction court entered a written order with findings of fact and conclusions of law in which it denied the petition.

## Analysis

On appeal, Petitioner argues that the post-conviction court erred when it denied post-conviction relief because trial counsel was constitutionally ineffective for failing to insure the presence of witness Sean McKeever at trial, for failing to properly cross-examine Mr. Chesney, for failing to sufficiently challenge the use of the audio tape of Mr. Chesney's photographic lineup during Detective Riddle's testimony, for failing to properly handle Mr. Lundy's verbal assault on trial counsel, and for cumulative error based on all of the above. Petitioner raised numerous claims of ineffective assistance of counsel in his original petition and at his post-conviction hearing, but he narrowed his focus in his brief on appeal to those claims addressed herein, thereby waiving all other grounds of ineffective assistance of counsel. *See* Tenn. Ct. Crim. App. P. 10(b). The State contends that Petitioner's trial counsel was effective and that Petitioner can show neither deficient performance nor prejudice to support his claims of ineffective assistance of counsel and cumulative error. We agree with the State.

- 7 -

Post-conviction relief is available for any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.*

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert v. State*, 342 S.W.3d 477, 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with a presumption of correctness given only to the post-conviction court's findings of fact. *Id.*

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Robert Edward Seaton*, No. E2019-01225-CCA-R3-CD, 2021 WL 754355 at *26 (Tenn. Crim. App., at Knoxville, Feb. 26, 2021) (citing State *v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010)). However, circumstances which would warrant reversal of a conviction under the

cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." *Id.*

*Sean McKeever*

Petitioner alleges that his trial counsel was ineffective for failing to ensure the presence of Sean McKeever, an alibi witness at trial or seeking a continuance in order for the witness to be present. The post-conviction court found that Petitioner failed to prove prejudice by failing to call Mr. McKeever at his Post-Conviction Hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that the failure to present proof on a witness that should have been called at trial generally is insufficient to prove prejudice). Neither the record nor Petitioner offer any evidence that the outcome of his trial would have been different had Mr. McKeever testified on his behalf. Further, trial counsel testified that she did not subpoena Mr. McKeever because the State had issued a subpoena for him. When it was discovered that he was not present at trial, trial counsel with the agreement of the State exhibited the transcript of Mr. McKeever's prior trial testimony. Despite trial counsel's having offered the transcript into evidence, which was marked and filed as "Exhibit 75," the transcript is not in the record on appeal. Given the absence of a record of Mr. McKeever's testimony, Petitioner has failed to prove his allegations of fact by clear and convincing evidence. *See Brian Pillow v. State,* No. M2018-01275-CCA-R3-PC, 2020 WL 7040532 at *7 (Tenn. Crim. App., at Nashville, Dec. 1, 2020). Petitioner has not established that trial counsel's failure to secure Mr. McKeever's live testimony at trial was deficient, or that his absence prejudiced Petitioner. Petitioner is not entitled to relief with respect to this claim.

*Carl Chesney*

Petitioner next claims that his trial counsel was ineffective for failing to sufficiently cross-examine Mr. Chesney, one of the victims of the shooting. However, Petitioner offered no proof at the post-conviction hearing for what would have constituted a more effective cross-examination, nor does Petitioner detail how Mr. Chesney's cross-examination was detrimental to him. Petitioner specifically argues that Mr. Chesney had no direct personal knowledge of the "critical events involving" Petitioner during the attempted robbery. However, Petitioner offers no further evidence. Therefore, Petitioner has not met his burden of proving that his trial counsel's performance was deficient in her cross-examination of Mr. Chesney, or in proving that Mr. Chesney's cross-examination prejudiced him. Petitioner is not entitled to relief on this claim.

Petitioner also contends that trial counsel was ineffective for allowing the audio recording of Mr. Chesney's police interview to be played for the jury. At the post-conviction hearing, Petitioner's testimony focused on his claim that he was unaware of the

audio recording until trial. In its findings, the post-conviction noted that the trial transcript indicated that trial counsel "was aware of the recording, prevented its playing in front of the jury, and had discussed with the prosecution the redaction of certain portions of the recording should it be played to the jury." On appeal, Petitioner does not challenge the post-conviction court's holdings on this issue, and we conclude that the record supports the post-conviction court's findings. Petitioner is not entitled to relief on this issue.

*Steve Lundy*

Although the trial transcripts are not in the record on appeal, at the hearing, the post-conviction court took judicial notice of the trial transcripts and trial record, so we consider the facts contained therein. This court may take judicial notice whether requested or not, and may do so at any stage of the proceeding. *State v. Lawson*, 291 S.W.3d 864, 868 (Tenn. 2009). This court "may consider . . . any additional facts . . . judicially noticed." Tenn. R. App. P. 13(c); *see also State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964). Accordingly, we take judicial notice of the trial transcripts and record.

Petitioner did not explicitly include in his petition the claim that his trial counsel was ineffective for failing to address the effects of Steve Lundy's outburst on the jury; however, Petitioner did generally claim that he received ineffective assistance of counsel. *See Marlon Yarbro v. State*, No. W2017-00125-CCA-R3-PC, 2018 WL 4441364, at *6 (Tenn. Crim. App., at Jackson, Sept. 17, 2018) (relief granted based on evidence adduced at the post-conviction hearing, although not raised in the post-conviction petition). At the post-conviction hearing, Petitioner testified that Mr. Lundy began to "scream and holler" during his trial counsel's cross-examination and that the jury was present for at least some of Mr. Lundy's outburst. Petitioner explained that following Mr. Lundy's outburst, his trial counsel expressed that she "didn't feel safe" and that she wanted extra security to be present in the courtroom. The State did not object to this testimony at Petitioner's post-conviction hearing.

During Steve Lundy's cross-examination at Petitioner's trial, the following exchange occurred, resulting in a recess and the jury being excused from the courtroom:

TRIAL COUNSEL: Did you talk to [the detective] that night at the scene at BJ's market?

MR. LUNDY: I'm going to have to say this, Your Honor. I—she's asking me too many questions. It's kind of like—I want to answer them fair, but the way she's asking all these different questions, I'm confused. I'm confused right now. And I don't know—she's confused me.

THE COURT: Take your time. There's no hurry. Just—

MR. LUNDY: It's like she's doing it on purpose.

THE COURT: She's doing her job, so . . . . Just do your best.

MR. LUNDY: I didn't want to come here.

THE COURT: I understand.

TRIAL COUNSEL: And, Mr. Lundy, I'm not trying to upset you. I'm just trying to find—

MR. LUNDY: I didn't want to come here. I said this was going to happen.

THE COURT: Mr. Lundy, please.

MR. LUNDY: I said it.

THE COURT: Mr. Lundy, calm yourself. We'll take about a ten-minute recess. Go with her for now. Just calm down. We'll be in recess for about ten minutes or so. Just go with your court officer.

The jury was present for the above exchange, was excused during the recess and returned at which time Mr. Lundy continued his testimony and responded to each of trial counsel's questions without further disruption. The record reflects that when Petitioner raised this issue during his testimony at the post-conviction hearing, the State did not raise an objection that Petitioner failed to include this issue in his post-conviction petition. *See George Washington Matthews v. State*, No. W2018-00966-CCA-R3-PC, 2019 WL 1110101, at *9 (considering an issue on the merits that was not specifically mentioned in the post-conviction petition, although alleged generally, because it was litigated at the post-conviction hearing without objection). Had the State objected, Petitioner would have been able to amend his petition, which the Post-Conviction Procedure Act contemplates and allows. *See* Tenn. Sup. Ct. R. 28, § 8(D)(5). Petitioner did not waive the issue regarding his trial counsel's failure to adequately address the effects of Steve Lundy's outburst on the jury.

Although this issue is reviewable on the merits, we conclude that Petitioner failed to establish that trial counsel was ineffective in addressing the effects of Steve Lundy's outburst on the jury. Petitioner argues that Mr. Lundy's outburst during trial, where he "began to scream [that he was being forced to testify by the State] . . . made [his] lawyer

uncomfortable," tainted the jury and undermined his right to a fair trial. Petitioner claims that the "verbal assault" by Mr. Lundy on trial counsel created a "reasonable suspicion of bias and prejudice" and that trial counsel "failed to undertake any inquiry of the jury whether they had been improperly influenced by this." However, at the evidentiary hearing, Defendant did not provide any proof of the jury's having been biased or influenced by Mr. Lundy's outburst. Petitioner also failed to question trial counsel on this issue, and during the post-conviction hearing, trial counsel offered no testimony as to the effect of Mr. Lundy's outburst on her ability to effectively represent Petitioner. Moreover, Petitioner conceded, and the record supports, that the jury stepped out when Mr. Lundy began his outburst. Petitioner has failed to prove deficient performance or prejudice on this claim and is not entitled to relief on this issue.

*Cumulative Error*

Finally, Petitioner claims that he is entitled to relief based on cumulative error. In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by trial counsel's cumulative error when the petitioner failed to show trial counsel's performance was deficient." *Thomas Edward Clardy v. State,* No. M2017-01193-CCA-R3-PC, 2019 WL 5046032 at *7 (Tenn. Crim. App., at Nashville, Oct. 17, 2018) (citing *James Allen Gooch v. State,* No. M2014-00454-CCA-R3-PC, 2015 WL 498724 at *10 (Tenn. Crim. App., at Nashville, Feb. 4, 2015). Because we have concluded that trial counsel's performance was not deficient and that there is no error in the judgment of the post-conviction court, there is no aggregate effect and Petitioner was not deprived of his right to a fair trial. Petitioner is not entitled to relief on this issue.

## Conclusion

Based on the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE